IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| VICKIE DANIELS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 08 C 6832 |
| | ) | |
| CITY OF CHICAGO, Chicago Police Officers | ) | Judge William J. Hibbler |
| PATRICK M. DARLING, Star # 7134, Sgt. D. M. | ) | |
| SEPULVEDA, Star # 1610, Sgt. MICHAEL E. | ) | |
| NUNEZ, Star # 2056, ROBERT BICKHAM, | ) | |
| Star # 19823, M. J. GALLAGHER, Star # 12713, | ) | |
| S. K. DEDORE, Star # 254, T. M. COLVIN, | ) | |
| Star # 7628, and Unknown Chicago Police | ) | |
| Officers, | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

## AFFIDAVIT OF WALTER SIGNORELLI

Under penalty of perjury as provided by law, I, Walter Signorelli, certify pursuant to 28

U.S.C. § 1746 that the following statements are true and correct:

1.    The statements made in this declaration are based on my personal knowledge. If called

upon to testify to the following facts, I would be competent to do so.

2.    I am over 18 years of age.

3.    I am a lecturer and adjunct professor at John Jay College of Criminal Justice and a retired

New York City Police Department Inspector.

4.    I was hired by Plaintiff's counsel to provide an expert report.

5.    I drafted the attached report and if called to testify, would testify consistently with the

report.

_____5/21/10_____
Date

_Walter Signorelli_____
Walter Signorelli

EXHIBIT

B

WALTER SIGNORELLI, ESQ.
1992 Commerce Street
Yorktown Heights, New York 10598


January 14, 2010


Loevy & Loevy
Attorneys at Law
312 N. May Street
Suite 100
Chicago, Illinois 60607

Re: Daniels v. City of Chicago, et al, 08 CV 6832
    U.S. District Court, Northern District of Illinois, Eastern Division

1. Pursuant to plaintiff's request and in accordance with Federal Rules of Civil Procedure, Rule 26 (a) (2), I have prepared this report, which constitutes my initial evaluation and conclusions within a reasonable degree of professional certainty of the actions and procedures employed by members of the City of Chicago Police Department in connection with this matter. My fee for preparation is $300 per hour and $2400 per day or part thereof for deposition or trial testimony. This evaluation is written on the basis of a review of the documents provided and my experience, training, education, and professional background, which are described below. I reserve the right to revise this opinion upon the receipt of additional information.

2. I am a retired member of the New York City Police Department (NYPD), having served for more than (31) thirty-one years. During my tenure, I held the ranks of Police Officer, Sergeant, Lieutenant, Captain, Deputy Inspector, and Inspector, and served in numerous capacities, including patrol officer, patrol sergeant, anti-crime sergeant, lieutenant tour commander, Executive Captain of the 46th Precinct, Bronx; Commanding Officer, Manhattan North Public Morals Division; Commanding Officer of the 79th Precinct in Bedford-Stuyvesant, Brooklyn; Commanding Officer, Staff Services Section of the Personnel Bureau; Commanding Officer, 24th Precinct., Upper Manhattan; Executive Officer, Bronx Narcotics Division; Commanding Officer, License Division; Executive Officer, Narcotics Division; Executive Officer, Manhattan North Narcotics Initiative; and Executive Officer, Brooklyn South Detective Division.

3. During my tenure, I conducted or supervised thousands of investigations and arrests. A various points in my career, I was assigned to executive positions in the Organized Crime Control Bureau, Patrol Precincts, the Bronx Borough Narcotics

Division, the Citywide Narcotics Division, the Police Commissioner's Manhattan North Narcotics Initiative, and the Brooklyn South Detective Division. All of the foregoing positions entailed training and supervision responsibilities regarding arrests, investigations, and interviewing witnesses and suspects.

4. Since my retirement from NYPD, I have taught police science and criminal law courses at John Jay College of Criminal Justice and St. John's University, including courses in police administration, criminal investigations, constitutional law, and criminal procedure law. I have been retained as a consultant by both plaintiffs and defense in a number of police liability cases, and have testified as a police procedures expert in both State and Federal courts.

<u>MATERIALS REVIEWED</u>

5. The following is a list of materials pertaining to the incident and individuals involved that I reviewed thus far:

   a. Amended complaint;
   b. Docket sheet;
   c. Vice case report;
   d. Arrest report;
   e. Training records of defendant officers;
   f. Event query;
   g. Laboratory report, worksheets, and results;
   h. Special Order 98-1;
   i. Special Order 05-02 and addenda 1,2,3;
   j. Special Order 98-13;
   k. Inventory sheets;
   l. Chain of custody sheet;
   m. Transcript of probable cause hearing;
   n. Audio recording of 911 calls;
   o. Four photographs of package;
   p. Deposition of plaintiff, Daniels;
   q. Deposition of Commander O'Grady;
   r. Deposition of Officer Gallagher;
   s. Deposition of Sergeant Sepulveda;
   t. Deposition of Officer Thomas;
   u. Deposition of Katherine Frost;
   v. Deposition of Officer Colvin;
   w. Deposition of Sergeant Nunez;
   x. Deposition of Lieutenant Dedore;
   y. Deposition of Officer Darling;
   z. Deposition of Jeffrey Buford;
  aa. Deposition of Hatem Masud;
  bb. Deposition of Jusuf Adarbeh;

cc. Deposition of Jennifer Callahan.
dd. Deposition of Officer Bickham

SUMMARY OF FACTS

6. My evaluation of the above material regarding this matter and my experience, education, and training leads me to form the opinion within a reasonable degree of professional certainty that the defendants violated the proper, accepted, and standard police practices and procedures for conducting a narcotics investigation, and the defendants' failure to conduct a proper investigation resulted in the wrongful arrest and incarceration of the plaintiff, Vickie Daniels.

7. On July 28, 2008, Hatem Masud called the Chicago police to his apartment at 6309 S. Spaulding regarding a package of white powder in his refrigerator freezer that he suspected might be narcotics. Police Officer Bickham, Police Officer Darling, and Sergeant Sepulveda, 8th District, responded and, in the rear of the freezer, found "a clear bundle wrapped with clear tape which contained 4 clear plastic bags each containing a white powder substance." (Vice case report). According to Masud, eighteen to twenty days before, Masud had bought flour at a local grocery for Ms. Daniels who was in his apartment cooking for her children. (13:11-24). The flour spilled, and he and Daniels transferred the flour into small plastic bags and put them in the refrigerator. (15:7-20).

8. Mr. Masud and his two roommates, Mr. Adarbeh and Mr. Aljaberi, were interviewed at the 8th District police station. Sgt. Sepulveda spoke to Daniels by phone, and she told him that the packages were "nothing but cooking flour." Daniels voluntarily came to the police station where she again stated that the material she packaged was cooking flour. (Arrest report). Masud indicated that he suspected his roommates of involvement with the package. He testified, "Because I found a lot of crooked things around me. I found a lot of things. Joseph making credit cards, buying brand new car and he don't pay me no rent. That's crazy....Yes, credit cards, state IDs, driver's license, Social Security numbers and buying all this brand new cars and you don't pay me rent. And he have six, seven different names." (93:19-24; 94:1-18). However, neither one of the roommates was arrested.

9. Masud testified that he did not think the package in the freezer was the same as the packages he and Daniels put in the refrigerator. He testified, "It was different completely. That's why I called the police." (20:15-22). He testified that he told the sergeant that Daniels said to him over the phone that the powder in the refrigerator was flour. He also testified that he told the sergeant that the suspected package in the freezer was not Daniel's flour. "No, I never said that. Because no way in the earth. Because maybe she think about flour we have inside the fridge, not this package." (278:10-23). He also testified that he never told the police that he saw Daniels put the suspected package in his refrigerator or freezer. (281:2-24).

10. Lieutenant Dedore, Sergeant Nunez, and Officer Colvin of the Gang Investigation Unit responded to the 8th District station to assist in the investigation.

11. Officer Colvin testified that he saw the package and thought it was heroin, apparently because it was wrapped in a manner similar to heroin packages he had seen. (64:5-24). Colvin was present while Sgt. Sepulveda questioned Daniels. He saw Sepulveda show her the package and heard her say it was flour. Colvin spent approximately an hour alone with Daniels in the interview room, and she continued to explain that the powder was flour. Colvin told Lieutenant Dedore, "She is still maintaining that it was flour." (18:5-7).

12. Lieutenant Dedore testified that when Daniels was shown the package, she said it was flour. (69:21-24). He testified that to his knowledge the only reason she was arrested was because she claimed ownership of the package. (103:1-13). He also testified that he was "confused" by her conduct, because she was calm although she knew she was going to jail. (126:15-23) His thoughts apparently were based on conjecture rather than on factual information, as he testified, "I'm sorry. I'm making a leap but, yet, it was my understanding she knew she was going to jail for that white power." (128:1-3) He also testified that he had never received any training regarding field testing kits. (116:6-7).

13. Sgt. Nunez used a field testing kit to test the powder. He testified that the test indicated that the powder contained amphetamine, a controlled substance. He testified that he had never charged anyone with possession of narcotics on the basis of a test kit result only because such results are not absolute and a laboratory analysis is required for a final result. (26:14-22). He also testified that he had never received any training for the use of field testing kits, (15:14-22), had not read the test kit instructions for years (39:1-3), and although he had used field testing kits for other types of controlled substances, he had never before used a test kit for amphetamines. (69:7-11). Furthermore, he did not conduct the test correctly. He used one test (Test A), but the instructions for Test A advise, "It is advisable that this test be used in conjunction with others as suggested in the Polytesting System." According to the instructions, he should have followed Test A with Test U, but did not.

14. Sgt. Sepulveda, the supervisor of the investigation, testified that the interviews of Daniels, Masud, Adarbeh, and Aljaberi revealed no additional factors indicating that the packages contained controlled substances (105:115-120), other than the packaging (119:3-18). He had not received any training regarding the use of field testing kits (6:19-23), but knew that the results of the field testing kit were not admissible evidence in court. Nevertheless, despite Daniels' repeated explanations that the powder was flour, he ordered the arrest of Daniels.

15. Daniels was arrested and charged with possession of a controlled substance, and the arrest report indicated that the powder was amphetamine, worth $528,000. This estimation likely contributed to the decision by the judge at arraignment to hold Daniels

in $30,000 bail, despite the fact that Daniels was employed, raising three children, and did not have a recent criminal record. Daniels was unable to post bail.

16. On August 13, 2008, the Illinois State Police laboratory issued a report indicating that a laboratory analysis had disclosed that the powder did not contain a controlled substance. Consequently, the case was dismissed and Daniels was released from jail.

17. Chicago Police Department, Narcotics Section, Special Order 98-1 pertaining to narcotics reagent test kits (NIK) states:

> The NIK test kits will only be utilized with the approval of a Narcotics Section supervisor. Members must use the proper test kit for the suspect substance being tested. The instructions for each kit are included with this order and they will be strictly followed. These kits will only be utilized to analyze a substance to determine probable cause in order to obtain a search warrant or prior to making an additional purchase.

18. Commander James O'Grady, the Commanding Officer of the Narcotics Section, testified in essence that although Special Order 98-1 is officially in effect, members of the Chicago Police Department are unaware of it. As he testified, "First of all, the people under my command aren't even aware of this order, because it is so old. And they – basically I wasn't aware of it either, until I researched it, and found in it an old binder. So officers, in the Narcotics Section, are unaware of this order, and they are using the tests kits as provided and following the instructions." (69:7-16). He also testified that his training sergeant said that he was unaware of this order and it had not been presented in several years to anyone, (11:7-11), and, furthermore, that he was unaware of any formal or informal training provided to Chicago police officers regarding the use of NIK. (41:13-20).

19. Commander O'Grady acknowledged that an arrest for possession of a controlled substance could not be based on the results of a NIK test only. He stated, "The field tests themselves would never be the only factors in making an arrest." (42:17-18).

### OPINION

20. In my opinion, the defendants violated proper, accepted, and standard police practices and procedures during the investigation of this matter and the arrest of the plaintiff for the following reasons.

21. NIK test results are not admissible evidence in court and are not used to establish probable cause for the presence of controlled substances because they are not scientifically reliable. As per Special Order 98-1, they are to be used for limited purposes only. As Lieutenant Dedore testified they are used primarily during a long-term narcotics investigation in which an undercover officer will make a series of buys from a drug dealer

5

or gang of drug dealers. If an undercover officer buys "beat" or phony drugs then returns to buy drugs again, the sellers will realize that the undercover officer is a police agent. Therefore, the NIK test is used as a means of lessening the possibility that the undercover officer will be exposed. A NIK test can also be used to test drugs bought in anticipation of a search warrant application. Since it is the evidence uncovered during the execution of the search warrant that will provide the basis for an arrest and prosecution, the NIK results are of only peripheral consequence. As implied by the order, NIK test results should not be the basis for an arrest. The unreliability of such tests and the potential for false positives (Buford, 72:1-24; 73:1-8), makes reliance on them unreasonable. Moreover, Buford testified that the field test result was consistent with flour, thereby, heightening the need to do a confirmatory analysis. In addition, the use of a NIK test on a suspected substance taints the substance and precludes the laboratory from conducting further chemical tests. Furthermore, in the instant matter, the officer who conducted the NIK test had never received training in the administering of NIK tests and had never conducted a test for amphetamine, which further diminished any semblance of reliability that could be attributed to the test results. Therefore, in my opinion, even if, for argument's sake, any evidence connected the plaintiff to the package, it was improper for the defendants to arrest and charge the plaintiff with unlawful possession of amphetamine before an official Illinois State laboratory test was conducted to determine whether amphetamine in fact was present in the powder.

22.   Police officers are trained that to make a lawful arrest they must have probable cause, and they are trained that probable cause consists of facts and circumstances that would lead a reasonable person to conclude that the person to be arrested committed, was committing, or was going to commit a crime. In this case, the manner in which the package was wrapped could be one factor in an assessment for probable cause, but by itself it is not sufficient to make an arrest without further evidence. All the facts are to be considered, including facts that point to innocence. In this matter, even if, for argument's sake, the officers could reasonably believe that the package contained amphetamine, they had no probable cause to conclude that Daniels placed amphetamine into the suspect package or had knowledge of amphetamine in the suspect package. A person can only be guilty of the unlawful possession of a controlled substance if they had knowledge that they possessed same. No facts were ever developed that Daniels knew about amphetamine in the refrigerator or freezer. Masud's apartment was searched and no evidence of drug dealing or drug paraphernalia was found, and the police did not attempt to search Daniels' apartment in an effort to develop evidence. Daniels was entirely forthcoming about the flour. She did not admit knowledge of amphetamine; she admitted only knowledge of flour. Her lack of a criminal history, employment, age, demeanor, cooperation should have been considered as part of the totality of the circumstances and should have militated against the police decision to arrest.

23.   Again, even if, for argument's sake, amphetamine were present in the package, Daniels was not found in possession of the package. The facts indicated she last was in the apartment eighteen days before the incident, and no evidence was developed indicating when the supposed amphetamine might have been added to the package. If

amphetamine had been added to the package, which it was not, it could have been added after she had been in the apartment. Moreover, Masud had two roommates who could have done so, if it had been done. These factors undermined any reasonable conclusion that Daniels could be lawfully charged with this supposed crime. Although the police believed the powder contained amphetamine, they did not have any evidence connecting Daniels to amphetamine. She admitted having flour, but three other persons had access to the apartment, and any one of them could have added amphetamine to the flour. Such a theory would have been far more reasonable than the speculation that Daniels was involved with amphetamine.

24. In my opinion, the police made assumptions and jumped to conclusions, and they failed to conduct a thorough and complete investigation. If, indeed, Sgt. Sepulveda asked Daniels over the phone about the package in the refrigerator, it was unreasonable to assume they were talking about the same package. As the complaining witness Masud testified, Daniels was most likely confused when she talked to the police. Masud testified, "Because I told you she remember the bag was in the fridge, not in the freezer. That's why maybe she said it was flour." (226:22-24). It is not uncommon for people to believe they are discussing the same object when, in fact, they are thinking about different objects. Daniels should have been asked whether the package was in the same exact condition as the packages she had filled. When Sgt. Sepulveda showed the package to Daniels, he held it in his hand, and she was not given a chance to examine it. The discrepancies between her memories of the separated packages and the bundled package were not explored.

25. In my opinion, the Chicago Police Department failed to properly supervise and train its officers in the proper use of the NIK tests. A Special Order had been issued regarding the proper use of NIK tests, but management obviously failed to ensure compliance with its provisions. None of the officers involved in this matter were aware of the order, or received training in the use of the NIK tests or the identification of drugs. Proper training would have alerted the officers that NIK tests can lead to the possibility of false positives. If the City had properly trained the officers, the officers would have known that the field test result supported Daniel's story. Without the proper training, officers might not know that NIK tests should not be used to establish probable cause to arrest, and without proper supervision regarding NIK tests and arrests, unlawful arrests are much more likely to have occurred than would have occurred had proper training and supervision been implemented.

## CONCLUSION

26. For the above reasons, it is my opinion within a reasonable degree of professional certainty that the defendants violated the proper, accepted, and standard practices for conducting an investigation of controlled substances in that they unreasonably relied on the results of a field testing kit to establish probable cause that the suspect powder was a controlled substance. Moreover, they improperly arrested the plaintiff on the basis of an inadequate investigation and ambiguous evidence that the plaintiff had any knowledge that the suspected powder contained a controlled substance,

which, in fact, it did not. In addition, the Chicago Police Department failed to properly train and supervise its officers to prevent such unlawful arrests as occurred in this matter.

Walter Sigaorelli

### WALTER SIGNORELLI, ESQ.
1992 Commerce Street
Yorktown Heights, N.Y. 10598
(914) 245 5904
E-mail: Walter2497@Aol.com

**PERSONAL**

Attorney, NYS Bar, 1984
Lecturer in Law and Police Science
Retired NYC Police Department Inspector
Consultant re: police procedures

**EDUCATION**

St. John's University School of Law
Juris Doctorate, Cum Laude, 1983
Awards: Criminal Law & Criminal Procedure

Columbia University School of Management
Police Management Institute, 1992

John Jay College of Criminal Justice, 1977

**PROFESSIONAL
QUALIFICATIONS**

**Management and
Administration**

Inspector, Deputy Inspector, Captain, NYC Police
Department. Commanding Officer of precincts, divisions, districts.

**Investigations**

Supervised investigative units in Detective Bureau,
Organized Control Bureau, and Narcotics Division.

**Licenses**

Admitted to practice law, New York State Bar Association, 1984

**Teaching**

Courses taught: Constitutional Law, Criminal Law,
Evidence, Criminal Procedure Law, Criminal Investigations, Police
Administration, Organized Crime

**PUBLICATIONS**

*The Crisis of Police Liability Lawsuits:
Prevention and Management*
Carolina Academic Press, 2006

Contributor: *Preparation Guide: State Trooper Exam*
Learning Express, N.Y., 2007

## EMPLOYMENT EXPERIENCE

| | |
|---|---|
| Jan. 1998 to Present | John Jay College of Criminal Justice<br>Lecturer and Adjunct Professor |
| March 2001 to Present | Attorney<br>Westchester County Defense Panel |
| 2000 to Present | Independent Consultant re: police procedures |
| 2004 to 2006 | St. John's University<br>Adjunct Professor |
| 1998 to 2004 | Worldlink Investigative Services, Inc.,<br>President |

1967 to 1998      New York City Police Department

| Rank | Dates | Assignments: |
|---|---|---|
| Inspector | 1997-98 | Detective Borough Brooklyn South |
| Inspector | 1996-97 | Narcotics Division, Man. North Initiative |
| Inspector | 1994-96 | Narcotics Division, Executive Officer |
| Inspector | 1991-94 | License Division, Commanding Officer |
| Dep.Inspector | 1990-91 | Chief of Patrol's Office, Community Policing |
| Dep.Inspector | 1989-90 | Narcotics Division, Bronx, Acting CO |
| Dep.Inspector | 1987-89 | 24th Precinct, Commanding Officer |
| Captain | 1985-87 | Personnel Bureau, Employee Management, Staff Services |
| Captain | 1983-85 | 79th Precinct, Commanding Officer |
| Captain | 1980-83 | Organized Crime Control Bureau,<br>Manhattan No. Public Morals Division, Commanding Off. |
| Captain | 1979-80 | 46th Precinct, Executive Officer |
| Lieutenant | 1977-79 | 50th Precinct, Desk Officer |
| Sergeant | 1974-77 | 70th Precinct, CO, Anti-Crime |
| Sergeant | 1973-74 | 88th Precinct, Patrol Supervisor |
| Sergeant | 1972-73 | 17th Precinct, Patrol Supervisor |
| Police Officer | 1968-72 | 80th Precinct |
| Police Officer | 1967 | Police Academy |

## PROFESSIONAL SOCIETIES

New York State Defenders Association
Westchester County Bar Association
Columbia University, Police Management Institute
American Academy of Professional Law Enforcement
New York State Association of Criminal Defense Attorneys
Academy of Criminal Justice Sciences
New York State Bar Association