

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

VICKIE DANIELS )
        )
    Plaintiff, )
        )
      v. )
        )
CITY OF CHICAGO, Chicago Police Officers )   No. 08 C 6832
PATRICK M. DARLING, Star # 7134, SGT. D.M. )
SEPULVEDA, Star # 1610, SGT. MICHAEL E. )   The Honorable William J. Hibbler
NUNEZ, Star # 2056, ROBERT BICKHAM, )
Star # 19823, M.J. GALLAGHER, Star # 12713, )
S.K. DEDORE, Star #254, T.M. COLVIN, Star )
# 7628, and Unknown Chicago Police Officers, )
        )
    Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiff Vickie Daniels brings this suit against the City of Chicago and a number of Chicago police officers, alleging Section 1983 and state law claims for false arrest, false imprisonment, unlawful detention, and conspiracy, along with additional state law claims for intentional infliction of emotional distress, malicious prosecution, *respondeat superior*, and indemnification. Her claims all stem from her arrest and 18-day detention for possession of a package the police found in her boyfriend's apartment that they believed to be drugs, but that tested negative in a narcotics test conducted by the Illinois State Police. She includes claims for municipal liability based on the City's alleged failure to properly train its police officers regarding the use of narcotics field tests. She claims that as a result of Defendants' actions, she suffered injuries that included severe emotional distress and lost wages. Defendants now move for summary judgment on all of Daniels's claims, setting forth defenses of probable cause and qualified immunity. For the reasons set forth below, the Court denies Defendants' motions

regarding the claims against the individual officers, but grants the motion with regard to the claims for municipal liability.

## I. Factual Background

The following relevant facts are undisputed, unless otherwise specified.

Daniels began dating a man named Hatem Masud in February 2008. (Def. Rule 56.1(a)(3) Statement (hereinafter "Def. St.") ¶ 4.) Masud lived in an apartment with his two roommates, Isaac and Joseph. (Def. St. ¶ 3.) About two months into their relationship, Daniels began to stay overnight at Masud's apartment one to four nights a week. (Def. St. ¶5.)

On July 28, 2008, Masud found a package in his freezer containing four individual plastic bags full of a white powder that were wrapped tightly together. (Def. St. ¶¶ 25, 38, & Ex. 15.) Masud thought that the package contained drugs. (Def. St. ¶ 26.) So, he proceeded to a nearby gas station, called 911, and reported that he had found drugs in his apartment. (Def. St. ¶ 27.) He waited on the street in front of his apartment for the police to arrive. (Def. St. ¶ 28.) Officers Darling and Bickham responded to the call and arrived at Masud's apartment several minutes later. (Def. St. ¶ 31.) Masud told the officers that he found what he believed to be a lot of drugs in his freezer and directed the officers to his freezer to show them the package. (Def. St. ¶ 34.)

Darling noticed that the package contained several "red dots" which he associated with a practice of narcotics packaging whereby actual narcotics are "cut" with a non-narcotic substance. (Def. St. ¶ 38.) Both officers thought that the package looked like drugs. (Def. St. ¶ 37.) Darling called his sergeant, Sepulveda, and asked him to come to the apartment. Sepulveda arrived shortly. (Def. St. ¶ 39.)

The police asked Masud who else was staying with him at the apartment and he told them about his two roommates, Joseph and Isaac. (Def. St. ¶ 42.) Daniels's name did not come up

while the police were at the apartment. (Def. St. ¶ 44.) The police asked how they could get in contact with Joseph and Isaac and Masud offered to contact them. (Def. St. ¶ 43.) One officer took the package to the police station. (Def. St. ¶ 45.) One officer gave Masud his cell phone number and asked him to call if he was able to get into contact with his roommates. (Def. St. ¶ 48.) Masud later met up with his roommate Joseph. The two of them met up with the police officers who had been at Masud's apartment in a store parking lot. (Def. St. ¶ 47.) The police questioned Joseph about the package and Joseph stated he had "no idea" about it. (Def. St. ¶ 48.) According to Plaintiff, he also told them that he opened the freezer every day. (Pl. Rule 56.1(b)(3)(C) Statement of Additional Facts (hereinafter "Pl. St.") ¶ 11.) Defendants deny that he made this statement. (Def. Resp. to Pl. St. (hereinafter "Def. Resp.") ¶ 11.) Both roommates indicated that they were suspicious of Isaac, who flaunted having a lot of money. (Pl. St. ¶ 8.) The parties dispute whether Joseph also told the police that Isaac was the only person who could be responsible for the package. (Def. Resp. ¶ 8.) Masud and Joseph proceeded to the police station and were placed in an office together. (Def. St. ¶ 49.) At the station, Joseph told the police he had not seen the package before. (Def. St. ¶ 50.)

Officers Bickham and Darling later met with Isaac in front of the apartment. (Def. St. ¶ 51.) They told Isaac about what Masud said he found in the freezer and Isaac denied any knowledge of the package. (Def. St. ¶ 52.) Isaac proceeded to the police station and was interviewed by the police again. (Def. St. ¶ 53.) The police showed Isaac the package and asked whether he had put it in the freezer at the apartment and Isaac stated again that he had never seen it before and did not know where it came from. (Def. St. ¶ 54.) When the police asked Isaac if anyone had access to his apartment besides him and his two roommates, he told them that a black female would come around to see Masud. (Def. St. ¶ 56.)

3

Sepulveda then asked Masud about the woman that Isaac had mentioned and Masud said that it was his girlfriend. (Def. St. ¶ 58.) Masud also said that she had access to the apartment. (Def. St. ¶ 60.) Sepulveda asked Masud how they could get in touch with his girlfriend. (Def. St. ¶ 61.) Then, while Sepulveda was in the room, Masud had a conversation with Daniels on his cell phone. (Def. St. ¶ 62.) The parties dispute exactly what Masud said during the conversation. While Defendants claim that Masud spoke with Daniels about what he found in his freezer, (Def. St. ¶ 62), Plaintiff denies this, (Pl. Resp. to Def. St. (hereinafter "Pl. Resp.") ¶ 62), and claims that Masud asked her about a package he found in the refrigerator and described it as four bags, (Pl. St. ¶ 17). The parties agree that during the conversation, Masud said to Sepulveda, "that's Vickie and she said it's not drugs, it's flour." (Pl. Resp. ¶ 63.) Plaintiffs also claim that at some point during the conversation, Masud told Daniels that the sergeant (Sepulveda) wanted to ask her about the flour in the refrigerator. (Pl. St. ¶ 18.) Defendants deny this claim. (Def. Resp. ¶ 18.)

Sepulveda then got on the phone with Daniels and said he needed to ask her "some questions about...[the] substance in the refrigerator. Is it flour?" (Def. St. ¶ 65.) In response, Daniels said, "[Y]eah, I know it's flour." (Def. St. ¶ 66.) Sepulveda then asked plaintiff to come down to the 8th District police station. (Def. St. ¶ 67.) At no time did Sepulveda or any other police officer tell her what the substance in the refrigerator was or how it was wrapped. (Pl. St. ¶ 18.)

Believing the package to be a large amount of narcotics, the police contacted Lieutenant Scott Dedore of the Organized Crime Division and Officer Tyson Colvin, a gang specialist, to determine whether the package was related to any gang or organized crime activity. (Def. St. ¶¶ 68-69.) They were both surprised that Daniels voluntarily came to the police station. (Pl. St. ¶

4

15.) Colvin was also surprised at Daniels' appearance and pleasant demeanor. (Pl. St. ¶ 15.) All of the officers were shocked at the significant amount of substance contained in the package. (Pl. St. ¶ 14.)

Daniels arrived at the police station, checked in at the desk, and said she was there to speak to a sergeant. (Def. St. ¶ 70.) Some time later, Sepulveda and a number of other officers came out to the front to speak to Daniels. (Def. St. ¶ 71.) The parties dispute whether they told her that they wanted to speak about the substance in the refrigerator, as Plaintiff claims, or about the substance in the freezer. (Pl. Resp. ¶ 71.) Plaintiff responded, "[T]he flour?" (Def. St. ¶ 72.) She then stated that she was aware of a "package of flour" either in the refrigerator (according to Plaintiff) or in the freezer (according to Defendants). (Pl. Resp. ¶ 72.) One of the officers then asked her what she did with the flour. (Def. St. ¶ 73.) She stated that she cooked with it. (Def. St. ¶ 74.)

There is some dispute as to the order of the subsequent events. Defendants claim that Colvin interviewed Daniels and thought that she appeared nervous, a fact that he related to Sepulveda. (Def. St. ¶¶ 77, 84.) Plaintiff admits that this conversation happened at some point, but claims that it happened after she was arrested and that the only conversation she had with Colvin before her arrest was small talk about her family. (Pl. Resp. ¶¶ 78, 84.) Instead, Plaintiff claims that Sepulveda told her, "we're going to test the flour. If it's flour, then you all can go home. There won't be no problem. But if it's other than flour, we have a problem." (Pl. St. ¶ 20.) Defendants admit that the police told her that they were going to test the substance in the package, but do not admit to the specific quote above. (Def. Resp. ¶ 20.)

Defendant Nunez then conducted a field test on the package. (Def. Resp. ¶ 22.) He made a small incision in the package in order to test some of the powder contained therein. (Def. St. ¶

93.) Upon seeing the substance in the package, Nunez did not think that it was heroin, because it was thicker. (Pl. St. ¶ 23.) Nor did he think it was cocaine, because it looked different. (Pl. St. ¶ 23.) He thought the substance might be methamphetamine, although it was not crystallized and he had never seen methamphetamine in a non-crystallized form. (Pl. St. ¶ 23.) So, he administered an amphetamine test kit. (Pl. St. ¶ 25.)

Nunez had never received any information from the Chicago Police Department as to the accuracy of the amphetamine test kit that he used, or any of the test kits. (Pl. St. ¶ 25.) He does not recall what the instructions are for the field test kit, had not read the instructions in years, and had never before used the amphetamine field test that he used on the package. (Pl. St. ¶ 26.) Plaintiffs claim that none of the other officers present had even seen a field test performed before, though Defendants dispute that claim. (Def. Resp. ¶ 28.) The record certainly does not seem to support Plaintiffs' claim with regard to Dedore, who testified at his deposition that he has some experience with field tests. (Def. St. Ex. 9 at 156:1-157:23.) The Chicago Police Department does not have any general orders, protocol, written literature, or videos relating to field testing narcotics. (Def. Resp. ¶ 29.) At the time he administered the test, Nunez heard from the other officers that Daniels said the package was flour. (Pl. St. ¶ 24.)

Nunez administered the field test by opening the field test kit, scooping out some of the powder from the package, placing it into the field test kit, closing the test kit, breaking a tube inside of the kit, and then shaking it. (Def. St. ¶ 93.) The contents of the field kit changed color. (Def. St. ¶ 94.) The officers thought that the color of the contents appeared to resemble the corresponding color for amphetamine indicated on the field test kit. (Def. St. ¶ 94.) In the photo of the test kit that Defendants submitted to the Court, both a gold and a brown square appear beside the word "amphetamine," with an arrow extending from the gold square towards the

brown square. (Def. St. Ex. 10 at Ex. 1.) Nunez then stated that the test was positive for amphetamine. (Def. St. ¶ 95.)

After the officers performed the field test, Sepulveda picked up the package and took it out into the lobby. (Pl. St. ¶ 30.) Daniels met the officers in the lobby. (Pl. St. ¶ 31.) At this point, the parties' stories diverge substantially. According to Plaintiff, Sepulveda asked her, as he held the package, "Was this the package you called flour?" (Pl. St. ¶ 32.) Daniels responded, "No, it wasn't wrapped like that." (Pl. St. ¶ 32.) Sepulveda then said, "Never mind the outside and how it's wrapped. Is this what you bagged?" (Pl. St. ¶ 32.) Daniels answered, "[N]o, that looks like drugs what you are showing me…That's not mine…I never seen that." (Pl. St. ¶ 32.) Defendants admit only that Daniels was shown the package, and that she admitted to the police that it looked like drugs. (Def. St. ¶ 87; Def. Resp. ¶ 32.) They also note that Daniels was able to identify other items in Masud's freezer, a fact that Plaintiff does not dispute. (Def. St. ¶ 86.)

Daniels was then arrested and handcuffed. (Pl. St. ¶ 33.) Plaintiff claims that one of the officers told her that they tested the package and that it tested positive for crystal methamphetamine. (Pl. St. ¶ 34.) Defendants dispute this contention on the grounds that the package tested positive for amphetamines generally. (Def. Resp. ¶ 34.)

The parties' stories continue to diverge after Daniels's arrest. Daniels contends that during a post-arrest interrogation by Colvin she continued to deny knowledge of the package and explained that she had previously been referring to flour that she and Masud had placed in some plastic bags a couple weeks earlier. (Pl. St. ¶¶ 38-39.) Defendants seem to admit that Daniels explained that she and Masud had purchased flour recently, but dispute that Daniels denied ownership of the package. (Def. Resp. ¶¶ 38-39.)

During Daniels's bond hearing, the prosecutor relied in part on the case reports. (Pl. St. ¶ 58.) Relying on the officers' statements in the case reports, she told the judge that Daniels said it was her package in the freezer, and that the package contained cooking flour. (Pl. St. ¶ 59.) She also noted that the package tested positive for methamphetamine in a field test. (Pl. St. Ex. G at 3-4.) The court ordered Daniels' bond set at $30,000 cash, which Daniels was unable to meet. (Pl. St. ¶ 60.) In the meantime the Illinois State Police (ISP) conducted further testing on the substance in the package and concluded that there was no scheduled substance found and that "starch" was indicated. (Pl. St. ¶ 61.) Daniels was detained at Cook County Jail until August 15, 2008. (Pl. St. ¶ 62.) A *nolle prosequi* order was entered in her case on that day, following the negative lab test results from ISP. (Pl. St. ¶ 62.) Daniels claims that as a result of her arrest and detention she lost wages, was traumatized, was terminated from her job, and has been unable to find employment since. (Pl. St. ¶ 63.) Defendants dispute these claims. (Def. Resp. ¶ 63.)

Daniels takes issue with any indication that the field test actually did produce a result that was consistent with the presence of amphetamines. (Pl. Resp. ¶ 94; Pl. St. ¶ 22.) Instead, Daniels argues that the field test indicated the presence of flour. (Pl. Resp. ¶ 94; Pl. St. ¶ 22.) The Court discusses the question of whether it can make a reasonable inference in Plaintiff's favor on this fact below.

Finally, while it is not relevant to most of the issues discussed below, as Defendants were unaware of these facts when they made their determination to arrest Daniels, the parties have provided some context for the above facts that helps make some sense of what happened in this case. More specifically, they provide limited explanation of how the package may have gotten into Masud's freezer and why Daniels was discussing bags of flour. It seems that 18 days before Masud made his discovery in his freezer, he purchased a five-pound bag of flour at Daniels's

request so that she could cook at his house. (Pl. St. ¶ 2.) When he returned, Daniels split open the side of the bag. (Def. St. ¶14.) Daniels apparently liked to keep flour in the refrigerator in order keep it fresh and to avoid infestation by mice and insects, and suggested that they put the flour in zipper bags. (Pl. St. ¶ 4.) However, Masud did not have any large zipper bags, so he offered Daniels long, narrow plastic bags instead. (Pl. Resp. ¶ 15.) Daniels began packaging the flour, but Masud took over as Daniels began to cook. (Pl. Resp. ¶¶ 16-17.) He packaged the flour in four of the bags, and placed them on the bottom shelf of the fridge. (Pl. Resp. ¶ 18.) He did not use the flour again. (Pl. Resp. ¶ 20.) Defendants claim that he may have placed the flour in the freezer rather than the fridge, though plaintiffs deny this. (Pl. Resp. ¶ 18.) Besides this disputed claim, there is no explanation for how the flour may have made its way into the freezer, and neither party offers an explanation for who might have wrapped the bags together in plastic wrap.

## II. Standard of review

Summary judgment is appropriate when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating there is no genuine issue of material fact, and judgment as a matter of law should be granted in their favor. *Id.* Once the moving party has met the initial burden, the non-moving party must offer more than a mere scintilla of evidence to survive summary judgment. *Roger Whitmore's Auto. Servs. v. Lake County, Ill.*, 424 F.3d 659, 667 (7th Cir. 2005). The non-moving party must produce specific facts showing there is a genuine issue of material fact, and that the moving party is not entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202

(1986). Finally, all evidence and inferences must be viewed in the light most favorable to the non-moving party. *Id.* at 255.

## III. Analysis

Defendants set forth three arguments for summary judgment. First, they claim that all of Daniels's claims are barred because there was probable cause to arrest and detain her. Second, they argue that Daniels's claims for municipal liability fail because, even assuming that she has established a constitutional violation, she cannot establish a causal connection between the city's policies and the violation. Finally, they claim that, even assuming the absence of probable cause, they are insulated from the Section 1983 claims by qualified immunity and from the state law claims pursuant to the Illinois Tort Immunity Act, 745 ILCS §§ 2/202, 2/208.

### A. Probable cause

Defendants' most prominent argument is that the officers had probable cause to arrest and detain Daniels. The inquiry into whether the police had probable cause is an objective one focusing on the facts known to the officer at the time of arrest. *Carmichael v. Vill. Of Palatine*, 605 F.3d 451, 457 (7th Cir. 2010). It is a "practical, common sense determination." *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1013 (7th Cir. 2006). Thus, it is "typically a proper issue for a jury if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Id.* at 1013-14 (internal quotation omitted). "Because probable cause is based on the totality of the circumstances, exculpatory evidence is also relevant." *Cervantes v. Jones*, 188 F.3d 805, 813 (7th Cir. 1999), *overruled on other grounds, Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001). However, "[w]hile an officer may not close his or her eyes to clearly exculpatory facts, the Fourth Amendment does not require an officer

with probable cause to arrest to wait while pursuing further investigation." *Stokes v. Board of Educ. of the City of Chicago*, 599 F.3d 617, 625 (7th Cir. 2010).

In order to succeed on this argument, Defendants must show that they had probable cause to believe: (1) that Daniels had possession of the package; and (2) that Daniels knew the package was narcotics. *People v. Miller*, 97 Ill. App. 3d 970, 972, 423 N.E.2d 1152, 1154 (Ill. App. Ct. 1981) (describing knowledge and possession as the two elements the prosecution must prove to obtain a conviction for unlawful narcotics possession). The parties dispute both elements, though in their discussion on the second element they focus more on whether the police had probable cause to believe that the package actually contained narcotics, rather than on Daniels's knowledge of that fact. It follows, however, that if the package did not actually contain narcotics, Daniels could not have known that it did.

Defendants do not claim that Daniels had actual possession of the package. Instead, they argue that the officers had probable cause to believe that she had constructive possession. "Constructive possession may exist where an individual is no longer in physical control of the drugs, provided that he once had physical control of the drugs with intent to exercise control in his own behalf, and he has not abandoned them and no other person has obtained possession." *People v. Adams*, 161 Ill.2d 333, 345, 641 N.E.2d 514, 519 (1994). In other words, it requires "an intent and capability to maintain control and dominion." *People v. Freiberg*, 147 Ill. 2d 326, 361, 589 N.E.2d 508, 524 (1992). "Where narcotics are found on premises under defendant's control, it may be inferred that he had the requisite knowledge and possession, absent other facts and circumstances which might leave a reasonable doubt as to guilt in the minds of the jury." *Id.* But, control over the premises is not a prerequisite. *Adams*, 641 N.E.2d at 519.

In support of their argument, the Defendants highlight a number of facts known to the police at the time of the arrest. First, they knew that Daniels had access to the apartment. While they cite to the record for support of the fact that she had a key and spent the night on a regular basis, they do not provide any support for the fact that the police knew these facts when they arrested her. Second, at some point during the investigation Daniels expressed some knowledge of the freezer and its contents. However, since Defendants do not specify whether she expressed this before or after her arrest, the court must, taking the facts in the light most favorable to Daniels, assume that the police did not know this fact prior to the arrest.

Third, Defendants argue that Daniels expressed knowledge about the package. But, given the standard of review applicable at this stage, the Court cannot accept this version of the facts either. Taking the facts in the light most favorable to the plaintiff, and making all reasonable inferences in her favor, Daniels responded to a question about "four bags" in the refrigerator (not the freezer) by stating that it was flour. She then voluntarily reported to the police station and continued to report knowledge of flour in the refrigerator. No one ever explained the odd appearance of the package to her. Finally, when she was shown the package, she denied any knowledge of it and pointed out that it looked different than the flour she had described. Perhaps the police had some reason to believe that Plaintiff was talking about the package when she was on the phone with Masud, despite the fact that he spoke about a substance found in the refrigerator, not the freezer. But, when all of these facts are taken together, the Court must conclude that it is at least disputed whether Daniels expressed any knowledge regarding the package that concerned the police.

On the other hand, the police did have knowledge of some exculpatory facts. While they knew that Daniels had some access to the apartment, they also knew that there were three men

who actually resided there, one of whom admitted to opening the freezer every day, and one of whom was singled out by his roommates as suspicious. They also knew that Daniels voluntarily reported to the police station despite her knowledge that the police were looking into the package. Indeed, the officers were surprised that Daniels would do so given their suspicion that it was her package of a large amount of narcotics. Finally, as noted above, they knew that Plaintiff's claims that she knew about the substance in the refrigerator changed drastically when she was shown the package. Given all of this, Defendants cannot show that there is no genuine dispute as to the material facts supporting a finding of probable cause to believe that Daniels had constructive possession of the package.

The relevant case law supports this holding. In Illinois, as noted above, the discovery of narcotics on premises under the control of a criminal defendant gives rise to an inference of possession and knowledge, absent other contradictory facts. *Freiberg*, 589 N.E.2d at 524. Moreover, the mere fact that others had access to the premises does not defeat constructive possession because the law recognizes the possibility of joint possession. *People v. Hill*, 226 Ill. App. 3d 670, 672-73, 589 N.E.2d 1087, 1089 (Ill. App. Ct. 1992). However, when more than one person has access to the premises, the State must provide corroborating evidence beyond control to support a finding of knowledge and possession. *People v. Wolski*, 27 Ill. App. 3d 526, 528-29, 327 N.E.2d 308, 309-10 (Ill. App. Ct. 1975) (reversing verdict where there was "no corroborating evidence linking the defendant to the contraband other than the bare fact that it was found in the apartment which he shares with his brother"). This makes sense given that a defendant's control over and access to an area "does not necessarily mean that the defendant has knowledge of the contraband in that area." *People v. Macias*, 299 Ill. App. 3d 480, 487, 701 N.E.2d 212, 217 (Ill. App. Ct. 1998).

In this case, the police knew that Daniels had access to the apartment, but nothing more. In fact, she was not even a resident, unlike the other three people that had control over the premises. In these respects, her case is analogous to *Macias*, where the court overturned a verdict against the defendant because the State only had evidence of defendant's access to the apartment (including that he had keys and had recently been inside), and nothing more. *Id.* at 216-18 (citing, *inter alia, Wolski*).

Here, as in *Macias*, there are also exculpatory facts that undermine any inference that Daniels had constructive possession, such as her cooperation, her denial, and her references to flour in the refrigerator. *See id.* (noting corroboration for defendant's story that he had been given keys in order to retrieve clothes from apartment and bring them to the resident of the apartment, who was in the hospital). Defendants argue that Daniels's claim that the package was not hers means very little because those guilty of crimes frequently deny them. However, what makes Daniels's denial different from the average denial is how and when she made it. Daniels admitted knowledge of a substance in the refrigerator, and even reported to the station voluntarily to discuss it. She did not make any denials until the moment when she saw the package for the first time, at which point she denied having ever seen it before and exclaimed that it looked like drugs.

Of course, most of the cases referenced above are criminal cases discussing the evidence necessary to convict and the mere fact that the police may not have had enough evidence to convict does not undermine a finding of probable cause. *United States v. Sawyer*, 224 F.3d 675, 679 (7th Cir. 2000) (probable cause "does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime"). However, in *Wheeler v. Lawson*, 539 F.3d 629 (7th Cir. 2008), the

Seventh Circuit reversed the trial court's decision to grant a defendant detective summary judgment in a Section 1983 false arrest suit on facts analogous to those present here, finding that he failed to establish probable cause. That case involved an arrest in Indiana for the crime of "maintaining a common nuisance." *Id.* at 633. But, in order to establish probable cause for an arrest for that offense, the detective had to show probable cause to believe the plaintiff had constructive possession of contraband, and the law in Indiana regarding constructive possession is substantially similar to the law in Illinois. *Id.* at 635 (control of the premises may give rise to an inference of knowledge and possession, but when control is non-exclusive, the State must point to additional corroborative evidence).

Unlike here, the plaintiff in *Wheeler* actually owned the premises in question, her garage, though she shared ownership with her husband and she gave others access to the garage on the day in question. *Id.* at 631. That night, the plaintiff awoke to the sound of an explosion in her garage and called 911. *Id.* at 632. The police arrived and found another cousin of hers (who she had not given access to the garage) dead in the garage with a bag of methamphetamine, surrounded by cans of starter fluid, propane tanks, lithium batteries, and ammonia residue, all of which are apparently indicative of an attempt to manufacture methamphetamine. *Id.* The defendant detective spoke briefly with the plaintiff, who told him she was unaware that her cousin had been present and unaware of any methamphetamine production taking place on her property. *Id.* The detective did not ask her about her use of the garage, whether she had any personal items in the garage, or about any of the methamphetamine-related items found in the garage. *Id.* The court found that without any corroborating evidence that the plaintiff knew about the items in the garage and the intent to use them for the manufacture of methamphetamine, the detective lacked probable cause to arrest the plaintiff. *Id.* at 638-39. The

court focused on the fact that the detective elicited very little from the plaintiff before arresting her, including nothing about her use of the garage or whether she kept personal items therein. *Id.* at 638. Instead, he attempted to point to statements she made in her deposition – evidence that was obviously not known to him at the time of the arrest. *Id.* Unfortunately, Defendants here are guilty of the same.

Given that Daniels did not even reside in Masud's apartment, and Defendants knew very little about her access to the apartment, let alone about her use of the freezer, *Wheeler* and the aforementioned criminal cases compel the Court to deny the summary judgment motion insofar as it relies on the presence of probable cause. Defendants are unable to show that there is no material dispute as to whether probable cause existed to believe that Daniels had constructive possession of the package.

Defendants do put forth one additional argument in support of their contention that they had probable cause to arrest Daniels that warrants mention because it is somewhat troublesome. Defendants claim that probable cause was supported in part by the fact that Daniels fit the criminal profile of someone that might hold narcotics for a gang. Apparently, Daniels fit this profile because she was a middle-aged mother who was continuously employed for the last 19 years, had no criminal record, and in all other respects appeared to be law-abiding. According to Defendants, this is precisely the type of person that a gang would target because she could hold their narcotics without attracting any suspicion. This argument is absurd for a couple of reasons. First of all, if the police believed that the drugs actually belonged to a gang, and that Daniels was keeping them specifically because she was immune to suspicion, why would Daniels keep them at somebody else's apartment? Secondly, and more importantly, while it might be appropriate in some circumstances for the police to rely on a criminal profile to enhance their basis for finding

probable cause, *see Simkunas v. Tardi*, 930 F.2d 1287, 1291 (7th Cir. 1991), it is most definitely inappropriate in an instance where the criminal profile is that of a law-abiding citizen. The reasons for rejecting such a profile are obvious: not only does it punish citizens for living upstanding lives, but it allows for virtually limitless expansion of police profiling. In other words, the police would be able to rely on criminal profiles (in conjunction with other evidence) to arrest people whether they fit the profile of a criminal or of a non-criminal, because in either instance they would actually fit the profile of a criminal.

### B. *Monell* liability

Because Defendants must show probable cause with regard to both elements of the crime, the Court can dispose of Defendants' probable cause defense on the basis of the analysis above. However, the Court must also address the question of whether Defendants had probable cause to believe that the package contained narcotics because it is relevant to the claims for municipal liability. Daniels claims that the City should be held liable under the theory upheld in *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 690-91, 98 S. Ct. 2018, 2035-36, 56 L. Ed. 2d 611 (1978), that a municipality may be sued under § 1983 for a constitutional deprivation caused by a municipal policy or custom. Daniels bases her claim on the fact that the City did not provide sufficient training or instruction to its officers regarding the use of field tests, but then allowed them to be used. Thus, Daniels can only succeed on her claim if she can show that this failure to train caused Defendants to arrest her without probable cause to believe that the package contained drugs.

In arguing that Daniels cannot make such a showing, Defendants rely heavily on the fact that the officers had probable cause to believe the package was narcotics even before conducting the field test. Daniels does not point to any case law suggesting that a field test is a prerequisite

for probable cause, or even argue that field tests are a reliable or sufficient method for obtaining probable cause. *Cf. United States v. Johnson*, 383 F.3d 538, 545 n.9 (7th Cir. 2004) ("the fact that [the officer] did not immediately field test the white substance believed to be contraband does not automatically" defeat probable cause justifying a search). The officers had in their possession a package of white powder wrapped in a suspicious way that, in their experience as police officers, resembled typical narcotics packaging. The package contained small red dots that Officer Darling associated with the practice of "cutting" narcotics with other substances. Even Daniels admitted that the package appeared to be drugs when she saw it that day, in her deposition, and in her brief on this motion. Defendants point to a number of cases where courts have relied on the police's discovery of a suspicious white powder to find probable cause. *See id.* at 545-46; *Ochana v. Flores*, 347 F.3d 266, 270-71 (7th Cir. 2003); *Garcia v. City of Chicago*, 24 F.3d 966, 970 (7th Cir. 1994).

Plaintiff responds by noting that in each case cited by Defendants, the arrestee either conceded that the powder's appearance was sufficient to establish probable cause, or its appearance was only one of a number of inculpatory facts relied upon by the courts. *See Johnson*, 383 F.3d at 545 n.9 ("[i]n addition to the discovery of the white powder [the officer] also had personal knowledge of [defendant]'s cocaine habit" and defendant appeared to be "strung out"); *Ochana*, 347 F.3d at 271-72 ("[t]he officers were also entitled to take into account...[plaintiff]'s impaired behavior, and his failure to give a coherent explanation of what was in the bag at the time of the arrest"); *Garcia*, 24 F.3d at 970 (plaintiff concedes that possession of a white powder provides probable cause for arrest). Defendants also had more to rely upon than the mere presence of a white powder – it was packaged in a very suspicious manner. The evidence they had fell short of that possessed by the officers in *Johnson* and

*Ochana*, so it is a closer call here than in those cases, but the Court finds that, prior to conducting the field test, Defendants had probable cause to believe the substance was narcotics.

As noted above, Defendants argue that this is enough. They contend that because they had probable cause at the moment they were shown the package, even if it was based on a relatively minimal amount of evidence, the Court's inquiry should end because any constitutional deprivation visited upon Daniels could not have been the result of the City's policy regarding field tests. However, as Defendants actually point out, the Court must determine whether there was probable cause at the moment of the arrest. *Carmichael*, 605 F.3d at 457. And the Court must consider the totality of the circumstances, including the exculpatory facts. *Cervantes*, 188 F.3d at 813. Here, unlike most cases, Plaintiff actually argues that the field test gave the police exculpatory evidence. Thus, the relevant inquiry is actually whether the field test provided the police with sufficient exculpatory evidence to undo the previously established probable cause.

Daniels's argument is tenuous. First, she notes that when Officer Nunez opened the package to remove a small amount of powder for the field test, he was unable to recognize the substance therein based on his prior experiences with narcotics. He did not think that it looked like cocaine or heroin. So, he took a guess that it was un-crystallized methamphetamine despite the fact that he had never seen methamphetamine in that form. Then, she suggests that the field test in this case actually tested positive for flour, rather than for a narcotic substance. She contends, therefore, that if the officers had been properly trained and notified of the possibility for such a result, they would have realized that the appearance of the substance and the test results corroborated Daniels's references to packages of flour in the fridge.

19

The main hurdle for Daniels to clear in making this argument is providing support for her claim that the test result was positive for flour. She is unable to point to any testimony affirmatively stating this to be the case. Instead, she points to testimony from Jeff Buford of the Illinois State Police Crime Laboratory, which performed the final tests on the package that showed that it was not amphetamine. Buford notes that prior to administering the final test on the substance, the ISP lab technician administered a preliminary color reagent test in order to narrow down the substances that she should test for with the final test. Buford does not testify that the color reagent used in that test is the same as the one used in the field test employed by Nunez. He simply says that they are similar tests in that they both use color reagents. However, he does indicate that a substance that turns orange when the preliminary test is administered may contain amphetamines. He also testifies that substances containing flour or starch turn orange when the preliminary test is administered. The substance found in Masud's apartment turned orange when the ISP lab administered this preliminary test. When Nunez administered the field test in this case, he thought that the substance turned a color somewhere in the range of gold to brown. Thus, in order to accept Daniels's argument that the field test indicated the presence of flour, the Court must make one of two inferences. First, the Court might assume that the reagent used in the field test is the same as that used in the preliminary test at the ISP lab and that the substance may have actually turned an orange shade when Nunez administered the field test. Or, the Court might simply assume that, just as in the preliminary test, the field test produced a result that was consistent with the presence of flour.

Even given the similarity between the "orange" and "gold" results produced by the two tests when amphetamines are present, the Court cannot reasonably infer that the tests use the same color reagent. There is simply not enough evidence available upon which the Court could

base such an assumption. However, given the fact that Daniels and Masud had in fact recently placed flour in plastic bags in the refrigerator and the fact that the final test administered by the ISP lab came back negative for amphetamines, but positive for "starch," the Court can reasonably infer that the package Nunez tested did actually contain flour. For the same reasons, the Court can also reasonably infer that the field test did actually indicate the presence of flour. However, there is no evidence supporting an inference that the field test result did not test positive for the presence of amphetamines. On the contrary, the fact that both substances produce an orange result in the preliminary test shows that the result of the field test could have been equally indicative of either substance.

Thus, even making all reasonable inferences in Daniels's favor, the most the Court can say is that the field test might have produced a result that was equally indicative of the presence of either flour or amphetamines. No matter how much training the City provided Nunez and the other defendants, such a test result would not provide them with enough exculpatory information to undermine the reasonable determination that they had probable cause to believe that the package in Masud's freezer contained narcotics.

For these reasons, the Court grants Defendants' motion for summary judgment on the *Monell* claims.

### C. Qualified immunity

The individual defendants next claim that, even if they lacked probable cause to arrest Daniels, they are entitled to qualified immunity from the § 1983 claims due to their status as police officers. "Qualified immunity protects those officers who make a reasonable error in determining whether there is probable cause to arrest an individual." *Wheeler*, 539 F.3d at 639. The Court must apply a two-part test to determine whether the officers are entitled to qualified

immunity in this case: "(1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Id.* (citing *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). In other words, the defense provides room for mistaken judgments regarding probable cause, so long as they are reasonable and do not conflict with clearly analogous case law. *Id.*

Because the Court has already denied Defendants' motion regarding its probable cause defense, the Court need only address the second prong of the test. The Court repeatedly compared this case to *Wheeler* above, so it is appropriate to look to the court's analysis of qualified immunity in that case as a starting point. The *Wheeler* court found that the defendant detective was entitled to qualified immunity because it was a close case and there was no case law that would have given the defendant a fair warning that his "conduct was unlawful in the situation he confronted." *Id.* at 640 (quoting *Saucier,* 533 U.S. at 202, 121 S. Ct. 2151).

The Court cannot point to *Wheeler* as an example of case law that would have provided Defendants with fair warning that their actions were unlawful because it was decided a few weeks after the events giving rise to this case transpired. However, taking the facts in the light most favorable to Daniels, Defendants in this case did not have as much evidence pointing to her guilt as the defendant in *Wheeler.* Unlike the plaintiff in Wheeler, Daniels did not reside in the apartment in question. The officers did not even know how frequently she was there or what Masud meant when he said she had "access." The plaintiff in *Wheeler* had also expressed some knowledge about who had access to the garage that day and defendant mistakenly (but reasonably) attached undue significance to the fact that plaintiff had the garage outfitted with a surveillance system. *Id.*

Additionally, as noted above, there are a number of Illinois decisions regarding constructive possession that indicate that Defendants had insufficient evidence to arrest Daniels here. *See, e.g., Macias*, 701 N.E.2d 212; *Wolski*, 327 N.E.2d 308. Finally, while the question of whether Defendants had probable cause to believe that the package was narcotics is much closer, the fact that there is a question further distinguishes this case from *Wheeler*. There are more disputed facts and less evidence indicative of Daniels's guilt in this case. Thus, the Court must deny Defendants' motion for summary judgment on the § 1983 claims. *See Sornberger v. City of Knoxville*, 434 F.3d 1006, 1014 (7th Cir. 2006) (denying qualified immunity defense because record could support conclusion that defendants ignored presence of exculpatory evidence and paltry nature of inculpatory evidence).

### D. Tort Immunity Act

Defendants' final argument is that the Tort Immunity Act protects them from liability on the state claims unless they engaged in willful and wanton or malicious conduct. *See* 745 ILCS §§ 10/2-202 & 2-208. This is a question of fact normally reserved for a jury. *See Williams v. City of Evanston*, 378 Ill. App. 3d 590, 597, 883 N.E.2d 85, 91 (Ill. App. Ct. 2007). Thus, the Court will only grant Defendants summary judgment if, based on the record, no reasonable jury could conclude that they engaged in such conduct. *See Carter v. Simpson*, 328 F.3d 948, 952 (7th Cir. 2003). "Under Illinois law conduct is willful and wanton if it 'shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others.'" *Id.* at 951 (quoting 745 ILCS § 10/1-210). Malicious conduct is conduct that is motivated by "improper motives." *Swick v. Liautaud*, 169 Ill. 2d 504, 524, 662 N.E.2d 1238, 1247-48 (1996) (defining malice in the context of the tort of malicious prosecution).

Daniels essentially points to four facts she believes support a finding of willful and wanton or malicious conduct. First, she notes that malice can be inferred from the lack of probable cause alone "if there is no other credible evidence which refutes that inference." *Frye v. O'Neill*, 166 Ill. App. 3d 963, 977-78, 520 N.E.2d 1233, 1242 (Ill. App. Ct. 1988). Second, she points out that, according to her version of the facts, Defendants arrested Daniels and interrogated her in order to see if her statements would, in the words of Sepulveda, "conflict later on," before they delivered the warnings required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Third, she points to Joseph's claims that he heard the individual defendants laugh and say that the package contained flour after they had arrested Daniels. Finally, she notes that when Masud walked out of the police station and said he was going to see a lawyer, he saw either Darling or Bickham give him the finger.

Defendants refute these arguments first by suggesting that their alleged failure to read Daniels her rights is irrelevant to this determination because *Miranda* warnings are only meant to ensure that an arrestee is aware of her privilege against self-incrimination and her right to an attorney. *Hanson v. Dane County*, 608 F.3d 335, 339 (7th Cir. 2010). Police do not violate an arrestee's constitutional rights simply by interrogating her. *Id.* Instead, a criminal defendant has the right to have such compelled statements excluded from her criminal trial if she was not given the *Miranda* warnings first. *Id.* While this is true, a reasonable jury might infer that Defendants' decision to attempt to elicit statements from Daniels that would not be constitutionally admissible at her criminal trial with the intent of using them to expose inconsistencies later on was indicative of their disregard for her constitutional rights.

Second, Defendants suggest that the officers may have been laughing at what seemed to them at the time to be a preposterous suggestion that the package contained only flour.

However, this is an inference in Defendants' favor, and the Court is required to make the opposite inference at this stage. Third, they argue that Masud's claims regarding the offensive gesture made by one of the defendants is irrelevant to the question of whether the officers were acting willfully, wantonly, or maliciously. Once again, Defendants seem to be asking the Court to make an inference in their favor. But a jury could infer from this offensive gesture, made in response to Masud's statement that he was going to hire a lawyer, that Defendants were acting with disregard to Daniels's constitutional rights or with improper motives that involved anger or disrespect.

Given the Court's determination that Defendants cannot yet establish probable cause, and that there is some additional evidence available to support an inference that they acted willfully, wantonly, or maliciously, the Court denies Defendants' motion to enter summary judgment on Daniels's state claims pursuant to the Tort Immunity Act.

## CONCLUSION

For the above reasons, the Court DENIES Defendant's motion for summary judgment on the claims against the individual defendants, but GRANTS the motion insofar as it concerns the claims for municipal liability on the basis of the City's policies or customs.

IT IS SO ORDERED.

_3/8/11_
Dated

_Wm. J. Hibbler_
Hon. William J. Hibbler
United States District Court